Filed 8/22/14  P. v. Martinez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CLAUDIO HUERTA MARTINEZ,<br><br>    Defendant and Appellant. | G047876<br><br>(Super. Ct. No. 11CF2795)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge.  Affirmed.

David L. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

INTRODUCTION

Defendant Claudio Huerta Martinez was convicted of three counts of sex offenses against a minor. On appeal, defendant argues that his convictions must be reversed because a juror, in violation of the court's instructions, conducted independent research regarding punishment, constituting prejudicial juror misconduct. Having reviewed the record independently, we conclude that, even if misconduct occurred, it was not prejudicial. We therefore affirm.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

All acts of molestation by defendant against the victim occurred when the victim was between six and eight years of age. The victim was a friend of defendant's son. She would go to defendant's apartment to play video games or play outside with defendant's son. When the victim was about six years old, defendant began molesting her. On the first occasion, defendant grabbed the victim, who was sitting on the floor playing video games, and pulled her onto a bed. Defendant touched the victim's chest through her shirt, removed his own pants, and told the victim to be quiet and not to be scared. On that occasion, defendant did not sexually penetrate the victim.

Another time, defendant saw the victim walking home from school and told her to come to his apartment and play with his son. When the victim arrived, she realized defendant's son was not home. Defendant threw the victim on the bed, removed his pants and her pants, and engaged in sexual intercourse with her. Defendant told the victim not to be scared.

On another occasion, the victim was playing with defendant's son at defendant's apartment. After the son went to the bathroom, defendant closed the door to the bedroom, removed his pants, and told the victim to remove her pants and underwear. The victim was afraid defendant would hurt her, and therefore did what he told her to do. Defendant told the victim to move to the bed, and engaged in sexual intercourse with her.

2

On another day, the victim and defendant's son were playing together, when defendant came into the room and got on the bed with the victim. Defendant's penis was outside his pants, but covered by a blanket. Defendant made the victim watch him masturbate, then told her to copy his actions. The victim did so until defendant ejaculated. On another occasion, defendant forced the victim to orally copulate him.

The victim did not report any of these incidents when they occurred because she was afraid of defendant. Defendant told the victim on many occasions that if she told anyone what he had done, he would "punch [her] until [her] blood comes out." The victim stopped playing with defendant's son, stopped going to his apartment, and always made sure she had someone with her when she went outside to play. Eventually, the victim told her friends what had happened, then told her parents. When the victim's parents confronted defendant, he claimed the victim had asked him to touch her.

When he was interviewed by the police, defendant claimed the victim had wanted to have sex with him. Defendant denied ever penetrating the victim, but admitted hugging her while simulating a sex act, touching her buttocks, and becoming aroused when she touched his penis.

In an information, defendant was charged with two counts of sexual intercourse with a child 10 years of age or younger, in violation of Penal Code section 288.7, subdivision (a) (counts 1 and 4), and two counts of committing a lewd act upon a child under 14 years of age, in violation of Penal Code section 288, subdivision (a) (counts 2 and 3). The information alleged defendant engaged in substantial sexual conduct within the meaning of Penal Code section 1203.066, subdivision (a)(8), with respect to count 3.

A jury convicted defendant on counts 2, 3, and 4. The jury could not reach a verdict on count 1, and did not make a finding on the substantial sexual conduct allegation. The trial court dismissed count 1 on the prosecution's motion.

3

The trial court sentenced defendant to 33 years to life in prison: 25 years to life with the possibility of parole on count 4, a consecutive determinate term of eight years on count 2, and a concurrent determinate term of eight years on count 3. Defendant timely appealed.

DISCUSSION

Defendant contends his convictions must be reversed because of prejudicial juror misconduct. At the outset of trial, the court instructed the jury not to use the Internet and not to consider punishment in reaching a verdict: "Do not do any research on your own or as a group. Do not use a dictionary, the Internet or any other reference materials. [¶] Do not investigate the facts or the law. . . . [¶] . . . [¶] . . . You must reach your verdict without any consideration of punishment." These instructions were repeated at the end of trial.

After the verdicts were read and the jury had been released, the court clerk received a telephone call from one of the jurors, which was entered into the minutes as follows: "Juror in seat #2 (badge #169) calls the clerk to inform the court that as he was walking out, juror in seat #12 told him, 'He'll get at least 10 years. I looked it up on the internet last night. They used to press for the death penalty.'"

Defendant's counsel filed a motion for a new trial based on juror misconduct. At a hearing, both Juror No. 2 and Juror No. 12 testified. Juror No. 2 testified he had recited Juror No. 12's statement about researching punishment on the Internet to the court clerk, "[a]bsolutely word for word." Juror No. 2 further testified the jury had reached verdicts on counts 2 and 3 on the first day of deliberations; at the end of that day, the jury was split eight to four in favor of guilt on count 1 and nine to three in favor of guilt on count 4. Juror No. 2 testified Juror No. 12 did not reveal any information regarding punishment during deliberations; Juror No. 2 never heard any juror discuss punishment.

4

The trial court questioned Juror No. 12 regarding his conversation with Juror No. 2:

"The Court: [¶] . . . [¶] Did you at any time use the Internet to acquire some information about the general subject matter of child molestation, child rape or anything like that?

"[Juror No. 12]: No.

"The Court: Did you, between the first day and the second day, do any research in regard to finding any information about the law in any way?

"[Juror No. 12]: No.

"The Court: As you were leaving the courtroom after the jury deliberations, did you make a comment to that other juror about sorry I had to hold you out and be a hold-out juror? Did you say anything like that to that gentleman?

"[Juror No. 12]: I made something like as holding everybody; they were kind of rushing me.

"The Court: Did you say something like last night I was looking on the Internet and you used to get life for this or get a life sentence?

"[Juror No. 12]: Life sentence?

"The Court: Did you make any kind of statement like that to that gentleman?

"[Juror No. 12]: I don't remember.

"The Court: Okay. And did you then make a statement now you get 10 to 20 years?

"[Juror No. 12]: When we were going out?

"The Court: Yes.

"[Juror No. 12]: Something like that, yes.

"The Court: And what did you base that information on?

"[Juror No. 12]: Not sure. No basis."

5

Juror No. 12 confirmed that the jury had reached verdicts on counts 2 and 3 after the first day of deliberations, but at that time was split on counts 1 and 4. He also testified he had not heard anyone talking about punishment during deliberations. Juror No. 12 had told Juror No. 2 the charge against defendant carried a prison term of 10 to 20 years, "because . . . remember when we had jury selection, I said my brother-in-law—my cousin from my wife's side got prosecuted for that."

After the hearing, the trial court found that Juror No. 2 accurately relayed the statement he had heard from Juror No. 12 to the court. The court made the following findings regarding Juror No. 12: "I'm unable to say—let me begin by the point that I believe that [Juror No. 2] heard the statement and accurately reported it back to this court. But the fact that the statement was made does not necessarily prove that the underlying act is true; okay? [¶] That, in fact, it occurred. It's an inference, but it's not the only inference, especially in light of the record that we have in this case. That this juror disclosed that his brother was serving time in Hawaii or had served time in Hawaii for a—for this kind of offense was a known fact by all parties. So that information is in his head all the time. [¶] If—there is no suggestion that that information, be it that he learned from his brother's case or that he learned from independent research on the Internet was ever shared with anyone. There's no testimony of that. So the only issue is, is he particularly now biased or a compromised juror because of that. [¶] . . . [¶] The . . . underlying reason why we have jurors not to consider the issue of sentencing or punishment is because it is an irrelevant factor, not necessarily that it's prejudicial."

After an exhaustive evaluation of cases addressing juror misconduct, the trial court found no prejudicial misconduct had occurred and denied the motion for a new trial.

A conviction must be reversed "'whenever . . . the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on

6

which the case was submitted to the jury.'" (*People v. Marshall* (1990) 50 Cal.3d 907, 950.) Juror misconduct raises a presumption of prejudice and, "'unless the prosecution rebuts that presumption by proof that no prejudice actually resulted, the defendant is entitled to a new trial.'" (*In re Stankewitz* (1985) 40 Cal.3d 391, 402.)

On appeal, we must accept the trial court's findings of fact and credibility determinations if they are supported by substantial evidence. (*People v. Mendoza* (2000) 24 Cal.4th 130, 195.) Whether prejudice occurred is a mixed question of law and fact that we review de novo. (*People v. Danks* (2004) 32 Cal.4th 269, 303.)

We conclude prejudicial misconduct did not occur in this case. Juror No. 12 testified he did not conduct any outside research, on the Internet or otherwise, regarding any aspect of the case. Juror No. 12 was aware of the likely punishment for defendant's crimes, due to his wife's cousin's prosecution for a similar crime. As the trial court noted, the fact Juror No. 2 accurately reported what Juror No. 12 said does not mean what Juror No. 12 said was true.

Both jurors agreed that Juror No. 12 never made any statements about punishment during deliberations, and that, indeed, punishment was never discussed during deliberations. This "tends to negate the inference the juror was biased . . . [and] to show the juror intended the forbidden information *not* to influence the verdict." (*In re Carpenter* (1995) 9 Cal.4th 634, 657.)

If Juror No. 12 did commit misconduct by looking up defendant's potential punishment on the Internet, we would conclude the arising presumption of prejudice had been overcome. "This 'presumption of prejudice may be rebutted . . . by a reviewing court's determination, *upon examining the entire record*, that there is no substantial likelihood that the complaining party suffered actual harm.' [Citation.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 819.) "When juror misconduct involves the receipt of information from extraneous sources, a substantial likelihood of juror bias 'can appear in two different ways. First, we will find bias if the extraneous material, judged objectively,

7

is inherently and substantially likely to have influenced the juror.  [Citations.]  Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant.  [Citation.]'  [Citation.]"  (*Ibid.*)  As the trial court noted, information regarding punishment is irrelevant and therefore would have been unlikely to influence Juror No. 12's vote because the information did not relate to guilt or innocence.  (See *People v. Nesler* (1997) 16 Cal.4th 561, 583-586 [information obtained by a juror independently, relating to character or past acts of the defendant or the victim, may be prejudicial in a case where the verdict depends on credibility].)

Given the information that Juror No. 12 allegedly researched and the circumstances of this case, we conclude no bias on the part of Juror No. 12 was proven. The evidence of defendant's guilt was strong.  The victim provided compelling testimony regarding defendant's acts of molestation, which was consistent from the outset of the investigation.  Defendant's attempts to accuse the six-year-old victim of approaching him sexually, while being forced to admit he had some sexual contact with her, made for a weak defense.

That Juror No. 12 changed his vote on count 4 from not guilty to guilty between the two days of deliberation does not establish prejudice.  First, the testimony of Juror No. 2 made clear that two other jurors also changed their votes on that count, without having heard anything about potential punishment.  This tends to indicate that it was the process of the deliberations, rather than any knowledge of the possible punishment defendant might receive, that caused Juror No. 12 to change his vote. Second, defendant provides no explanation for why Juror No. 12 changed his vote on count 4, based on the information regarding punishment, while he did not similarly change his vote on count 1.  If his knowledge of the likely punishment defendant would face changed Juror No. 12's vote on count 4, there would be no reason for him to have

8

continued to be a holdout on count 1. There is no substantial likelihood that Juror No. 12's vote was influenced by his exposure to any information on punishment.

DISPOSITION

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.